UNION MUTUAL INSURANCE COMPANY, Plaintiff/Respondent,

v.

Diane T. BROWN, Defendant,

Charles Schlemer and Jan Schlemer, Defendants/Appellants.

No. 58877.

Missouri Court of Appeals, Eastern District, Division Three.

April 16, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 15, 1991.

David J. Rauscher, Kathleen L. Rauscher, Clayton, for defendants-appellants.

F. Douglas O'Leary, Christina Rush, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Kenny, St. Louis, for plaintiff-respondent.

CRANE, Judge.

Defendants Charles Schlemer and Jan Schlemer appeal from the judgment of the trial court granting summary judgment in favor of plaintiff insurer in a declaratory judgment action in which the trial court found no insurance coverage under a homeowners policy issued by plaintiff to co-defendant Diane T. Brown. We affirm.

Defendants Charles and Jan Schlemer were the parents of Matthew Schlemer, who was fatally injured while in the care and at the home of his babysitter, co-defendant Brown. Brown pleaded guilty to involuntary manslaughter. Charles and Jan Schlemer brought a wrongful death action against Brown in the St. Louis County Circuit Court which is pending. Plaintiff Union Mutual Insurance Co. [Union Mutual] brought this action seeking a declaratory judgment that the incident was excluded from coverage under its homeowners policy issued to Brown because the injury arose out of a "business pursuit" and/or the injury was "expected or intended." The trial court granted summary judgment in favor of plaintiff and declared that there was no insurance coverage under Union Mutual's policy to Brown. Brown does not appeal.

Defendants Charles and Jan Schlemer, hereinafter collectively referred to as defendants, raise three points on appeal. They argue that the entry of summary judgment was erroneous because there were genuine issues of material fact whether Brown provided regular home day care services to Matthew Schlemer within the "business pursuits" exception to the homeowners policy and whether the injuries were the result of an intentional act within the "intentional act" exclusion of the policy. They also contend that Brown was prejudiced because her court-appointed trustee was not notified of the motion for summary judgment.

■ In reviewing the entry of summary judgment, we must view the record in the light most favorable to the party against whom summary judgment was granted, determine if any genuine issue of material fact exists which would require trial and determine if the judgment is correct as a matter of law. If the judgment is sustainable as a matter of law under any theory, we will affirm it. *Kutz v. Cargill, Inc.*, 793 S.W.2d 622, 624 (Mo.App.1990); *Blankenship v. Better Business Bureau*, 782 S.W.2d 131, 132 (Mo.App.1989); Rule 74.-04(c). Since the deletion of subsection (h) from Rule 74.04, it is no longer necessary for the moving party to support a motion for summary judgment by unassailable proof. *Defino v. Civic Center Corp.*, 780 S.W.2d 665, 667 (Mo.App.1989).

We first address whether Diane Brown's activities in caring for Matthew Schlemer constituted home day care services within the business pursuits exception to the homeowners policy. The exclusions section of the homeowners policy provides that coverage does not apply to bodily injury or death arising out of *"business* pursuits" of an insured. Endorsement 10–322 to the policy specifically provides that home day care is a business pursuit in the following circumstances:

> If an *insured* regularly provides home day care services to a person or persons other than *insureds* and receives monetary or other compensation for such services, that enterprise is a *business* pursuit.

The uncontested facts as disclosed by the deposition of Diane Brown and transcript of her plea of guilty are that Diane Brown and Jan Schlemer met when both were employed at Emerson Electric. Brown was a financial analyst and Schlemer was a secretary in the same department. They did not socialize outside the office. At a department lunch in June, 1987, Schlemer learned that Brown was leaving Emerson to stay home with her baby. Schlemer, who had a nine month old son, Matthew, told Brown that she was going to try to work part time herself. Brown informed Schlemer that she would be interested in babysitting for Matthew on a part-time basis. Schlemer told Brown that she would discuss that possibility further with her

when she went on a part-time schedule. Money was not discussed. In August, 1987, Schlemer called Brown and told her she needed someone to babysit for Matthew for a few days and it would be a good way for her to try babysitting to see if it would work out. She also told Brown that she would begin working Tuesdays, Thursdays and alternate Wednesdays in September and would need a babysitter for Tuesdays and Thursdays. Brown told Schlemer that she had paid $10 a day for babysitting when she was working and that she thought it was a reasonable price. Other people also told her it was an average, reasonable price. They agreed on that fee. In September, 1987, Brown began babysitting Matthew at her home every Tuesday and Thursday. Occasionally she would sit on a Wednesday instead of a Thursday. She did not sit on Thanksgiving, Christmas or when either her child or Matthew was sick. She did not sit for any other children. Schlemer paid Brown on Thursdays for the week. Brown and her husband reported this income on their income tax returns. Brown testified that she babysat for the money and as an accommodation to Schlemer.

In January or February, 1988, Brown told Schlemer that she would terminate the babysitting arrangement in July because she was expecting another child. On March 1, 1988, a Tuesday, Brown told Schlemer that she should find other arrangements for Matthew as soon as possible because she was pregnant and under stress. On Thursday, March 3, while Matthew was in her care and at her home, Brown threw Matthew to the floor twice, causing a fatal skull fracture.

■ Defendants argue that the home day care exclusion does not apply because the services were not regular and that Brown did not have a profit motive in caring for the child. We disagree. There was no dispute that the services were to be provided every Tuesday and Thursday. Giving the word "regular" its plain meaning, we find that this was a regular provision of services. In the context of this exclusion, the definition of "regular" as "steady or uniform in course, practice or occurrence; not subject to unexplained or irrational variation" and "returning, recurring or received at stated, fixed or uniform intervals" is appropriate. Webster's Third International Dictionary. It was not necessary that the care be full time. "The word, 'regularly,' is not synonymous with constantly or continuously." *Fowler v. Baalmann, Inc.*, 361 Mo. 204, 234 S.W.2d 11, 14 (1950). The fact that care was not provided on holidays or during illness or that days were occasionally shifted does not defeat the regularity of the arrangement since these are expected and rational exceptions to any day care arrangement.

■ Furthermore, the insured's motive in providing the day care is irrelevant. The policy definition requires only that the insured be compensated in order for the services to fall within the exclusion. There was no dispute that Brown received $10 a day for providing day care.

■ Defendants rely on *Western Fire Insurance Company v. Goodall*, 658 S.W.2d 32 (Mo.App.1983), in which we held that the business pursuits exclusion to a homeowners policy did not apply to the babysitting activities of an insured who cared for two other children 40 hours a week for compensation while caring for her own children. In that case we noted that "most cases recognize ... that babysitting as a mere accommodation to friends, neighbors or relatives or babysitting for pin money is not a business pursuit." *Id.* at 34. Defendants also rely on language found in *Safeco Insurance Co. v. Howard*, 782 S.W.2d 658 (Mo.App.1989), in which we found child care to be a business pursuit where the insured under a homeowners policy operated a day care business five days a week and earned $15,000 to $20,000 each year from it. We found "[t]here was the requisite profit motive and continuity of business." *Id.* at 659. While the existence of a "profit motive" or the desire to "accommodate" may be factors in determining whether day care is a business pursuit when the policy is silent on the question, as was the case in *Goodall*, it is not a factor where, as here, the policy has specifically set out when day care is a business pursuit. The fact that the insured had given notice that the arrangement was to be terminated did not alter the nature of

the arrangement pending termination. Because this policy contained an endorsement specifically defining that regularly provided day care for compensation constitutes a business pursuit, neither *Western Fire* nor *Safeco* controls the definition of business pursuit in this policy. Under the exclusions of this policy there was no coverage for Brown's provision of home day care to one child for two days every week for compensation.

Because we find that there was no genuine issue of material fact which would require trial relating to the applicability of the "business pursuits" exception to the policy, and the judgment is sustainable as a matter of law under this theory, we do not reach the question of whether the "intentional act" exclusion may also apply. Furthermore, because defendants have no standing to assert error committed against co-defendant Brown, *Steele v. Yacovelli*, 419 S.W.2d 477, 479 (Mo.App.1967), and claim no prejudice to themselves arising from the alleged lack of notice to Brown's trustee, we do not reach the merits of their third point.

The judgment of the trial court is affirmed.

REINHARD, P.J., and STEPHAN, J., concur.